### TUNISON v. GUTHRIE et al.

### In re DAKOTA COAL & COKE CO.

(Circuit Court of Appeals, Fourth Circuit. July 22, 1918.)

#### No. 1622.

ATTORNEY AND CLIENT ☞135—CONTRACT—PERFORMANCE.

Under the evidence, *held*, contract of attorney with financially embarrassed mining company to rearrange its affairs, so as to relieve it from control of its sales agent, and directors from liability as indorsers, was not performed, so as to entitle attorney to the stipulated fee.

Appeal from the District Court of the United States for the Northern District of West Virginia, at Philippi, in Bankruptcy; Alston G. Dayton, Judge.

In the matter of the Dakota Coal & Coke Company, bankrupt. From a decree of the District Court, reversing ruling of the referee, and directing refusal of the claim of B. C. Tunison, allowed by the referee, over objections of Doty Guthrie and others, claimant appeals. Affirmed.

E. M. Showalter, of Fairmont, W. Va., for appellant.

G. B. Shaw, of Greensburg, Pa. (Neely & Lively, of Fairmont, W. Va., and John C. Silsley, of Greensburg, Pa., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and CONNOR, District Judge.

KNAPP, Circuit Judge. In the fall of 1915, the Dakota Coal & Coke Company, a West Virginia mining corporation, was in financial straits. It owed altogether upwards of $150,000, including notes to the amount of about $85,000, indorsed by its directors and the appellee Guthrie, and some of its creditors were pressing. Its sales agent was the Commonwealth Fuel Company, of Pittsburg, and that concern seems to have been in charge and control of its coal operations. It was indebted to the fuel company to the aggregate of about $51,000, subject, perhaps, to some offsets. This indebtedness included six notes, of $1,000 each, indorsed by directors, and also a note of $20,000, secured by like indorsement and by a mortgage or deed of trust which the fuel company was threatening to foreclose. The secretary of the coal company, W. H. Cochrane, lived in Pittsburg, and meetings of the directors were often held at his office in that city, or at the office of the fuel company.

At the instance of Cochrane, the appellant, Tunison, a Pittsburg lawyer, had several conferences with some of the directors at Greensburg, Pa., at which the affairs of the company were fully discussed. Omitting details, it transpired that Tunison offered to submit a plan of relief, if paid the compensation he demanded. On the 19th of October a resolution was adopted, as appears from the minutes of the board, to the effect that appellant be paid the sum of $5,000 "for a plan to raise and pay such moneys on a plan evolved by him on which to refinance and refund pressing obligations, and especially the trust deed of the Commonwealth Fuel Company, provided said plan is accepted by this board and put into successful operation by him with the assistance of this board and the company, and that said refunding be accomplished, all to be done by him in the best interests of the company and in no wise to be done in any other interests." A few days later, in a communication too long to reproduce, Tunison submitted two plans, one for a bond issue, which was impracticable, because the company held its coal lands only by lease, and the other for a transfer of the sales agency to the firm of Hite & Rafetto, who he stated would take over the obligation secured by the trust deed, extend the time of payment, and reduce the interest thereon, and make certain advances of money, etc. As to the results which would be secured he said:

"This plan relieves the directors and Mr. Guthrie of their indorsement upon the $20,000 note, as well as the six $1,000 notes held by the fuel company, and materially reduces the indorsement liability of Mr. Guthrie and the directors. * * * These sales agents will have absolutely nothing to do with the principal operation of the properties, neither will they undertake to keep the books of your company. They will be merely exclusive sales agents."

He also stated, what the directors apparently understood before, that the fuel company would accept $40,000 in cash in full of all its claims against the coal company and assign the same to the nominee of the board. At a meeting held on the 28th of October it was voted, though not unanimously, to accept this plan, and a committee of two, Cochrane and Director E. E. Morris, was appointed "to negotiate and close a contract with sales agent as proposed in the communication of B. C. Tunison this day received and filed, and that said committee have full discretion in providing for the details of such contract." The minutes of that meeting, after a minor correction, were "approved as read" on the 4th of November.

The committee made a contract with Hite & Rafetto, dated October 29, and in a report to the board, under date of November 3, asked a ratification of its action in that regard. The minutes of the November 10 meeting show that the report was "ordered withdrawn," and that no vote was taken on the motion to ratify the contract; the chair ruling that, "as the contract had been executed by the committee appointed to negotiate and close it, ratification by the board was unnecessary." Under this contract, to which further reference will presently be made, Hite & Rafetto became the "sole and exclusive" sales agent of the company. They gave Tunison, acting for the committee, the $35,000 agreed to be advanced, of which $20,000 was for an assignment to them of the note for that amount indorsed by the directors and secured by deed of trust, as above stated. Of the $15,000 balance, for which the company was to give them its note, $14,000 was paid to the fuel company in full of its unsecured claim, stated to be $25,628.20 as of September 30, and $1,000 retained by Tunison on account of his services. A contract with the fuel company of about the same date provided for the termination of its agency and for the gradual payment of the six $1,000 notes, indorsed by the directors and Guthrie, which that company continued to hold.

Whatever relief the coal company thus obtained proved to be but temporary, for it was adjudicated bankrupt a few months thereafter. In due course Tunison filed a claim for the balance alleged to be due upon a contract to pay him $5,000 for professional services. The five appellees, two of them creditors and all of them stockholders of the corporation, filed objections to the claim, but it was allowed in full by the referee. Upon petition for review the court below, by decree of August 6, 1917, reversed the ruling of the referee and directed that the claim be refused. Tunison appeals. In the meantime, owing to the rapid advance of coal prices and the value of coal properties, the trustees were able to pay to creditors the full amount of their claims, and to stockholders a dividend of 44 per cent. on the par value of their shares.

For the purpose of deciding the case thus outlined, it will be assumed that Tunison was duly employed to advise and assist the company in its grave embarrassment, that nothing appears which made it improper for him to act as its attorney, that his written proposal to the board of directors and their acceptance of the same by resolution constituted a valid contract, and that he is not shown to have acted other-

wise than in entire good faith. But we are nevertheless of opinion that his claim was properly rejected as a contract obligation, for the reason that he failed in essential respects to accomplish results in accordance with his representations; and there are some circumstances connected with his employment which seem to justify holding him to at least the substantial performance of his undertaking. He had been for some time the attorney of Hite & Rafetto, and continued to represent them afterwards. Their contract with the coal company was drawn by him, and they had no other counsel. He was the personal attorney and friend of Cochrane, and it was Cochrane's insistence, to put it mildly, that got from the board a reluctant assent to his proposal. In view of these relations, if on no other account, it was due to himself, as well as the directors, that he secure for them the benefits they had a right to expect from the arrangement.

In important particulars his promises were not fulfilled. For example, in his communication of October 27 he repeated the assurance that the plan therein proposed would restore to the company the actual management of its plant, then in the hands of the fuel company, and this appears to have been strongly desired by the directors. But the contract two days later with Hite & Rafetto expressly bound the company to employ a superintendent and manager to be approved by them, which in effect put the whole mining operations under their control. And so it quickly turned out. The manager appointed by the board on the 10th of November, Cochrane voting in the negative, was virtually forced to resign after a service of 11 days, because he was said to be unsatisfactory to Hite & Rafetto, and Cochrane thereupon appointed another manager, who presumably met with their approval. It would seem that the committee had no power to make such a contract, since its only authority was to "close a contract with sales agent as proposed in the communication of B. C. Tunison," and manifestly that communication, with reference to the provision here considered, was of quite the opposite import. But, even if the contract actually made, though unratified, be binding on the company, which we decline to hold, the fact remains that in this material respect Tunison failed to meet the conditions of his employment.

It was also definitely stated in his proposal, as quoted above, that the plan presented by him would relieve the directors from their liability as indorsers on the notes of the fuel company; and this was confirmed by his own testimony before the referee, as follows:

"Q. In your letter submitted, your proposition in writing, did you not state that the plan you had to propose would release the indorsers on the $20,000 note? A. Yes, sir; I did. Q. And on the six $1,000 notes? A. Yes, sir. Q. And that it would materially reduce the liability of Mr. Guthrie and the other directors? A. I did."

But this promise, to so describe it, was in no part kept. Hite & Rafetto simply took over the $20,000 note, with all the security therefor which the fuel company held, and there was no discharge or reduction of any indorser's liability.

Without further recital, it is enough to say that all Tunison did, so far as we can see, amounted to little more than a transfer of the sales

agency to Hite & Rafetto, with the incidental extension of time on the fuel company's debt and some abatement of interest on the $20,000 note. This was so far short of what he undertook to accomplish as to deprive him of the right to enforce a contract made in reliance upon his representations. That he performed services of considerable value to the company is not to be doubted, but the claim here presented is not based upon quantum meruit, and we have no occasion to consider whether the $1,000 he retained was sufficient compensation.

Affirmed.

---

⊚⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes